**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HELENNA LYNCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10CV 2280 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Helenna Lynch for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income under Title XVI of the Act.  This case has

been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice

Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has

filed a Brief in Support of the Complaint.  (Document Number 12).  Defendant has filed a Brief in

Support of the Answer.  (Doc. No. 14).

**Procedural History**

On May 9, 2008, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on January 28, 2008.  (Tr. 85-94).  This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated February 25, 2010.  (Tr. 41-48, 4-18).  On

- 1 -

October 18, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 1-3).   Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

**A.     ALJ Hearing**

Plaintiff's administrative hearing was held on December 3, 2009.  (Tr. 21).  Plaintiff was present and was represented by counsel.  (Id.).  A vocational expert was also present.  (Id.).

The ALJ examined plaintiff, who testified that she lived in a home with her fifteen-year-old son and her seven-year-old daughter.  (Tr. 22).

Plaintiff stated that she had a GED and received vocational training as a manager.  (Id.). Plaintiff testified that she worked as a manager at White Castle for eight years, and at Jack-in-the-Box for four years.  (Id.).  Plaintiff stated that she managed twelve to fourteen people at these positions.  (Id.).

Plaintiff testified that she had received unemployment benefits until October of 2009.  (Tr. 23).  Plaintiff stated that she had been looking for work because she had no income to support her children.  (Id.).  Plaintiff testified that she looked for work at the Missouri Career Center.  (Id.). Plaintiff stated that she interviewed at American Staffing in June of 2009, but did not take the job because she was unable to perform factory work due to her hand impairment.  (Id.).

Plaintiff stated that she had been in jail on three occasions due to unpaid traffic tickets. (Tr. 24).  Plaintiff testified that she last spent time in jail in November of 2009.  (Id.).

Plaintiff's attorney indicated that plaintiff was unable to work due to recurrent hernia surgeries and recurrent infections of the hernia site.  (Tr. 25).  Plaintiff's attorney stated that

- 2 -

plaintiff also suffers from finger contractures of the bilateral fingers.  (Id.).  Plaintiff's attorney indicated that the cause of the finger contractures was unknown at that time, although plaintiff had recently undergone EMG testing and was awaiting the results.  (Id.).

Plaintiff testified that she last underwent a hernia surgery in July of 2008.  (Id.).  Plaintiff stated that her doctors recommended another hernia surgery but she had been unable to undergo surgery due to recurring infections with drainage in the hernia site.  (Tr. 26).  Plaintiff testified that she sees her doctor monthly for treatment of the hernia site infection.  (Id.).

Plaintiff stated that she cooks and gets her children ready for school.  (Id.).  Plaintiff testified that her fifteen-year-old son helps her with household chores and helps her cook.  (Id.).  Plaintiff stated that her sister helps her style her daughter's hair.  (Id.).  Plaintiff stated that her son does most of the dishes.  (Tr. 27).  Plaintiff testified that her landlord does the yard work.  (Id.).  Plaintiff stated that her aunt helps her shop for groceries because it is difficult for her to grasp heavy items, such as a gallon of milk.  (Id.).  Plaintiff testified that her son usually helps her put away groceries, although she is able to do it by herself when her son is not home.  (Id.).

Plaintiff stated that the fifth finger of both hands contracts and she is unable to straighten her finger.  (Tr. 28).  Plaintiff testified that this has been occurring since she was a child, and that she first reported the problem to a doctor when she was nine.  (Id.).  Plaintiff stated that surgery was discussed, but she never underwent surgery.  (Id.).  Plaintiff testified that she was able to work with her fingers contracted.  (Tr. 29).  Plaintiff stated that this impairment worsened, and that she started taking over-the-counter pain medication to help the pain.  (Id.).  Plaintiff testified that, at the time of the hearing, she was taking prescription pain medication, which did not help her pain much.  (Id.).  Plaintiff stated that she underwent nerve conduction testing on November

- 3 -

17, 2009. (Tr. 30). Plaintiff testified that her elbows started hurting during the summer of 2009, and that Dr. Zarmeena Ali at St. Louis Connect Care administered shots in her elbows. (Id.).

Plaintiff stated that her hernia is preventing her from working because she is barely able to bend down. (Id.). Plaintiff testified that the hernia site still drains when she moves a certain way. (Tr. 31). Plaintiff stated that Dr. Codner at St. Louis Connect Care is treating her hernia, and that he has indicated that it could take months or years before the site stops draining. (Id.). Plaintiff testified that her doctors do not want to perform surgery due to the risk of infection. (Id.).

Plaintiff stated that she stopped working for Jack-in-the-Box in January of 2008. (Id.). The ALJ noted that the record reveals that plaintiff reported to Connect Care that she was still working for Jack-in-the-Box. (Id.). Plaintiff testified that Jack-in-the-Box was not paying for her health insurance. (Tr. 31). Plaintiff stated that she applied for medical assistance through Connect Care and that Connect Care contacted a case worker at the Division of Family Services. (Tr. 32).

Plaintiff testified that she mostly lies down during the day. (Id.). Plaintiff stated that her medication makes her drowsy. (Id.). Plaintiff testified that she does not belong to any clubs or organizations. (Id.). Plaintiff stated that she does not go out with friends. (Id.). Plaintiff testified that she had not wanted to go out since she stopped working for Jack-in-the-Box in January 2008. (Tr. 33).

Plaintiff stated that her sister comes over to help plaintiff style her daughter's hair. (Id.). Plaintiff testified that she has difficulty holding her arms up for long periods, but she is able to bathe, dress herself, and brush her teeth. (Tr. 34). Plaintiff stated that she has difficulty fastening buttons, and that she requires assistance buttoning her pants. (Id.). Plaintiff testified that she tries

to wear pants with elastic waistbands.  (Id.).

Plaintiff stated that she enjoyed reading the newspaper.  (Tr. 34).  Plaintiff testified that she was able to write, although her handwriting was messy due to her finger impairment.  (Id.).  Plaintiff stated that she was unable to type on a computer or typewriter because her fifth finger would not stretch.  (Tr. 35).  Plaintiff testified that she used one finger to type when she went to the Missouri Career Center to try to find work.  (Id.).

Plaintiff stated that she was able to stand for a few hours, although she could not have her hands hanging down at her side too long.  (Id.).  Plaintiff testified that she was able to sit for two to three hours.  (Id.).  Plaintiff stated that she was able to walk for a couple blocks.  (Id.).  Plaintiff testified that she was able to lift less than ten pounds.  (Tr. 36).  Plaintiff stated that she experienced difficulty lifting a five-pound bag of potatoes.  (Id.).

Plaintiff testified that she weighed 192 pounds.  (Id.).

The ALJ requested that plaintiff's attorney obtain and submit the records from St. Louis Connect Care and Barnes Jewish Hospital regarding plaintiff's nerve conduction testing.  (Id.).

## B.    **Relevant Medical Records**

On March 31, 2008, plaintiff underwent wound exploration, incision, and drainage of an infected wound of the abdominal wall status post umbilical hernia[1] repair.  (Tr. 162).

Plaintiff saw Robert Taxman, M.D. at St. Louis Connect Care urgent care on February 5, 2009, with complaints of worsening pain in the hands extending up both forearms, bilateral contracted fifth fingers, and difficulty grasping objects.  (Tr. 329).  Plaintiff reported chronic aching pain in both

---

[1]Hernia in which bowel or omentum protrudes through the abdominal wall under the skin at the umbilicus.  Stedman's Medical Dictionary, 881 (28th Ed. 2006).

hands and wrists since childhood.  (Id.).  Upon examination, Dr. Taxman noted flexion contractures of both little fingers with deformed, hypertrophic PIP joints.[2]  (Tr. 330).  Plaintiff's hand grip was 3/5 on both sides.  (Id.).  Dr. Taxman's assessment was chronic arthralgias[3] and deformity consistent with rheumatoid arthritis.[4]  (Id.).  Dr. Taxman prescribed Naproxen.[5]  (Tr. 331).

Plaintiff saw Zarmeena Ali, M.D. at St. Louis Connect Care on February 27, 2009.  (Tr. 325). Upon examination, Dr. Ali noted digital contracture of the fifth digit at the PIP joint.  (Id.).  Dr. Ali's assessment was Dupuytren's contracture.[6]  (Id.).  Dr. Ali noted that plaintiff's condition was likely congenital and that her prognosis was poor given the long-standing contracture.  (Tr. 326).  Dr. Ali prescribed Tramadol[7] for pain as needed, and ordered x-rays.  (Id.).

Plaintiff underwent x-rays of the hands on February 27, 2009, which were negative.  (Tr. 327).

─────────────────────

[2]The proximal interphalangeal joint ("PIP joint") is the synovial joint between the proximal and middle phalanges of the fingers and of the toes.  Stedman's at 1015.

[3]Pain in a joint.  Stedman's at 159.

[4]A generalized disease, occurring more often in women, which primarily affects connective tissue; arthritis is the dominant clinical manifestation, involving many joints, especially those of the hands and feet, accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular cartilages, which become eroded; the course is variable but often is chronic and progressive, leading to deformities and disability.  Stedman's at 160.

[5]Naproxen is indicated for the relief of rheumatoid arthritis.  See Physician's Desk Reference (PDR), 2633 (63rd Ed. 2009).

[6]A disease of the palmar fascia resulting in thickening and shortening of fibrous bands on the palmar surface of the hand and fingers, resulting in a characteristic flexion deformity of the fourth and fifth digits.  Stedman's at 436.

[7]Tramadol is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See PDR at 2429.

Plaintiff saw Ira Kodner, M.D. at St. Louis Connect Care on March 26, 2009, with complaints of an open wound and drainage with no pain. (Tr. 320). It was noted that plaintiff had undergone umbilical hernia repair with placement of mesh in July 2008, and that her post-operative course was complicated by some superficial wound drainage, which resolved after several weeks. (Id.). In January 2009, plaintiff noted a small area of skin breakdown in her previously healed incision; the wound opened and drained purulent material. (Id.). Plaintiff noted some erythema[8] and discomfort, a minimal amount of swelling, and continued drainage of small amounts of material. (Id.). Dr. Kodner's assessment was very small, superficial wound infections, likely foreign body reaction; no deep infection; no tract or cavity. (Tr. 321). Dr. Kodner recommended local wound care with antibiotic ointment. (Id.).

Plaintiff saw Dr. Ali on March 27, 2009, for a follow-up visit, at which time she continued to complain of pain radiating in her arms bilaterally along the medial side of the elbow. (Tr. 317). Plaintiff indicated that her pain was tolerable with Tramadol and Tylenol. (Id.). Plaintiff also reported poor hand grip bilaterally. (Id.). Upon examination, Dr. Ali noted that plaintiff had a normal hand grip, and contracture of fifth digit bilaterally (Tr. 318). Dr. Ali's assessment was arthralgias in multiple sites and medial epicondylitis.[9] (Id.).

Plaintiff saw Dr. Kodner on June 25, 2009, at which time she reported continued leakage at the hernia site. (Tr. 313). Dr. Kodner's assessment was very small, superficial wound infections. (Id.). Dr. Kodner ordered a CT scan to rule out mesh infection, fluid collection, or abscess. (Id.).

_____

[8]Redness due to capillary dilation, usually signaling a pathologic condition. Stedman's at 666.

[9]Inflammation of an epicondyle, which is a projection from a long bone near the articular extremity above or upon the condyle. See Stedman's at 653.

Plaintiff underwent a CT scan of the abdomen on July 14, 2009, which revealed a small umbilical hernia containing omental[10] fat.  (Tr. 311).

Plaintiff saw Khalida Qalbani, M.D. at St. Louis Connect Care urgent care on July 14, 2009, with complaints of worsening hand and arm pain.  (Tr. 306).  Dr. Qalbani's assessment was medial epicondylitis and multiple arthralgia.  (Tr. 307).  Dr. Qalbani administered an injection of an analgesic.  (Id.).

Plaintiff saw Dr. Kodner on July 23, 2009, at which time plaintiff reported intermittent pain and continued drainage at the incision site.  (Tr. 303).  Dr. Kodner indicated that he would review plaintiff's CT scan with another doctor and call plaintiff with a plan.  (Tr. 304).

On July 30, 2009, plaintiff reported that she was dropping dishes frequently and had a poor hand grip.  (Tr. 300).  Upon examination, Dr. Ali noted contracture of the little finger PIP joint on flexion bilaterally and tenderness on palpation at the medial epicondyle of both elbows.  (Tr. 301).  Dr. Ali noted that plaintiff was crying profusely.  (Id.).  Dr. Ali diagnosed plaintiff with medial epicondylitis and cubital tunnel syndrome.[11]  (Id.).  Dr. Ali administered injections for pain and ordered EMG testing.  (Tr. 302).

On August 6, 2009, plaintiff saw Anne Yi-Jiun Lin, M.D. at St. Louis Connect Care for follow-up regarding plaintiff's wound infection.  (Tr. 296-97).  Dr. Lin indicated that the wound seemed to have improved compared to the prior week.  (Tr. 297).  Dr. Kodner indicated that plaintiff's umbilical wound had improved on August 13, 2009.  (Tr. 295).  On August 20, 2009, Dr.

[10]A fatty structure passing from the stomach to another abdominal organ.  See Stedman's at 1364.

[11]A group of symptoms that develop from compression of the ulnar nerve within the cubital tunnel at the elbow; can include paresthesia into the fourth and fifth digits and weakness of some of the intrinsic muscles of the hand.  Stedman's at 1895.

Kodner's assessment was improving abdominal wound not actively draining at clinic today. (Tr. 293). On September 24, 2009, Dr. Kodner noted that the CT scan revealed that the mesh had shifted over to the right side, which would require surgery once the infection has resolved. (Tr. 284).

Plaintiff saw Anginette Browder, NP-C at North Central Community Health Center on September 16, 2009, requesting a referral for surgery. (Tr. 260). Upon examination, Ms. Browder noted a small amount of greenish crusted discharge from the umbilicus, along with a bulge to the right of the umbilicus, which was slightly tender to touch. (Tr. 261). Ms. Browder's assessment was umbilical hernia without obstruction or gangrene. (Id.). Ms. Browder referred plaintiff to surgery at St. Louis Connect Care. (Id.).

Plaintiff saw Dr. Ali on September 29, 2009, at which time she continued to complain of bilateral hand pain in the fifth digits that radiates to her elbows bilaterally. (Tr. 281). It was noted that plaintiff had been seen in the neurology clinic and was given Tramadol but had not taken it. (Id.). Dr. Ali's assessment was cubital tunnel syndrome. (Tr. 282). He recommended that plaintiff try wrist splints at night. (Tr. 283).

On November 5, 2009, Dr. Ali completed a Physical Residual Functional Capacity Questionnaire. (Tr. 251-55). Dr. Ali indicated that he had been treating plaintiff since March 2009 for diagnoses of bilateral flexion contracture of the fifth digit and carbital tunnel syndrome. (Tr. 251). Dr. Ali listed plaintiff's symptoms as complaints of pain in the hands, insomnia, poor hand grip, and contracture since age nine. (Id.). Dr. Ali indicated that plaintiff's impairments were not reasonably consistent with her symptoms and functional limitations. (Tr. 252). Dr. Ali noted that all work-up was negative. (Id.). Dr. Ali found that plaintiff was not a malingerer. (Tr. 251). Dr. Ali expressed the opinion that plaintiff could sit a total of two hours in an eight-hour workday, stand a total of two

hours in an eight-hour workday, rarely lift or carry up to ten pounds until her hand pain issue resolves, occasionally perform all postural activities, and would never be absent from work as a result of her impairments.  (Tr. 253-54).  Dr. Ali also found that plaintiff's pain or other symptoms would frequently interfere with attention and concentration needed to perform even simple work tasks.  (Tr. 252).

Plaintiff saw Dr. Kodner on November 5, 2009, at which time plaintiff still had drainage from her umbilicus with no pain.  (Tr. 362).  Plaintiff also reported that the bulge in her umbilicus  caused her to experience discomfort at work.  (Id.).  Dr. Kodner's assessment was non-healing wound (sinus tract) at umbilicus.  (Id.).  Dr. Kodner stated that he was "not sure if another surgery to fix the hernia is in the patient's best interest, especially given the non-healing/chronic wound risk."  (Id.).

Plaintiff underwent electromyography on November 17, 2009, at Washington University School of Medicine Department of Neurology, which was normal.  (Tr. 369).

On December 10, 2009, Dr. Kodner stated that plaintiff's CT scan had been reviewed and it appeared that the mesh had shifted down and to the right after plaintiff's July 2008 surgery.  (Tr. 360).  Upon examination, Dr. Kodner indicated that he thought he could feel a non-reducible, "tiny hernia."  (Id.).  Dr. Kodner's assessment was sinus tract draining small amount of purulence[12] from superior umbilicus; concern that possibly necrotic omentum is in hernia contributing to the drainage.  (Id.).   Dr. Kodner indicated that he would determine what surgical options were available for plaintiff.  (Id.).

---

[12]Pus.  Stedman's at 1607.

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2.    The claimant has not engaged in substantial gainful activity since January 28, 2008, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: flexion contractures of the bilateral 5th digits and superficial wound infection at the site of a hernia wound.  (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work. She is able to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently.  She can sit for at least 6 hours in an 8-hour workday.  She can stand and/or walk for up to 6 hours in a typical 8-hour workday.  This description of the claimant's remaining work-related physical capabilities coincides with that described for light work in accordance with 20 CFR 404.1567(b).

6.    The claimant is capable of performing past relevant work as an assistant manager at a fast food restaurant.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from January 28, 2008 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 9-15).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed

- 11 -

on May 9, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on May 9, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 15).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.      The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which

- 13 -

inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.       Plaintiff's Claims

Plaintiff first argues that the ALJ erred in failing to obtain testimony from a vocational expert. Plaintiff next argues that the ALJ erred in determining plaintiff's residual functional capacity.  Plaintiff also contends that the ALJ failed to properly consider all of plaintiff's severe impairments.  The undersigned will discuss plaintiff's claims in turn, beginning with the severity of plaintiff's impairments.

## 1.       Severe Impairments

Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify

- 14 -

as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling as well as capacities for seeing, hearing, and speaking.  See 20 C.F.R. § 404.1520(b)(1),(2).  Basic work activities also include understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  See 20 C.F.R. § 404.1520(b)(3)-(6).  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  While the burden is not great, the claimant bears the burden at step two to demonstrate a severe impairment that significantly limits the ability to perform basic work activities.  See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).  The sequential evaluation process may be terminated at step two when the claimant's impairment or combination thereof would have no more than a minimal effect on the claimant's ability to work.  See Simmons v. Massanari, 264 F.3d 751, 755 (8th Cir. 2001).

In this case, the ALJ found that plaintiff had the following severe impairments: flexion contractures of the bilateral 5th digits and superficial wound infection at the site of a hernia wound. (Tr. 9).  Plaintiff argues that the ALJ failed to consider plaintiff's recurrent hernias, multiple hernia repairs, and migration of the mesh as severe medically determinable impairments.

The ALJ properly found that plaintiff's "superficial wound infection at the site of a hernia wound" was a severe impairment.  (Tr. 9).  The ALJ acknowledged that plaintiff had undergone multiple umbilical hernia repairs, and that the last surgery took place in July 2008.  (Tr. 13).  The ALJ also described plaintiff's history of ongoing infections with drainage at the site of the previous hernia

- 15 -

repairs.  (Id.).  The ALJ noted that Dr. Kodner treated plaintiff for the complications associated with the hernia wound.  (Tr. 12-13).  The ALJ noted that a July 2009 CT scan revealed that plaintiff's mesh hernia repair might have shifted over to the right side, and that plaintiff would need another surgery after her superficial wound infection healed.  (Tr. 12).  In addition, the ALJ indicated that plaintiff was diagnosed with umbilical hernia without obstruction or gangrene in September of 2009. (Id.).  The ALJ pointed out that, although plaintiff's wound continued to drain, plaintiff did not complain of pain.  (Id.).

The undersigned finds that the ALJ did not err in failing to find that plaintiff's recurrent hernias, multiple hernia repairs, and migration of the mesh were severe impairments.  The ALJ discussed plaintiff's recurrent hernias, hernia repairs, and migration of the mesh, and determined that plaintiff's superficial wound infection at the site of a hernia wound was a severe impairment.  This determination is supported by substantial evidence.  Plaintiff consistently received treatment for infections associated with the hernia wound since her alleged onset date of January 28, 2008. Although it was found that the mesh had shifted, and that plaintiff had a possible small hernia at the end of 2008, plaintiff did not complain of pain associated with these issues.  Further, plaintiff's prior hernia repairs occurred prior to her alleged onset date.  While the ALJ could have included plaintiff's recurrent hernias, multiple hernia repairs, and migration of the mesh in his description of plaintiff's severe hernia wound impairment, his failure to do so was not error, as these impairments did not result in any additional limitations.  See Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case.").

**2.      Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Specifically, plaintiff contends that, in determining plaintiff's residual functional capacity, the ALJ failed to afford controlling weight to the opinion of plaintiff's treating physician, Dr. Ali.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the

- 17 -

nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Dr. Ali completed a Physical Residual Functional Capacity Questionnaire on November 5, 2009. (Tr. 251-55). Dr. Ali indicated that he had been treating plaintiff since March 2009 for diagnoses of bilateral flexion contracture of the fifth digit and carbital tunnel syndrome. (Tr. 251). Dr. Ali listed plaintiff's symptoms as complaints of pain in the hands, insomnia, poor hand grip, and contracture since age nine. (Id.). Dr. Ali indicated that plaintiff's impairments were not reasonably consistent with her symptoms and functional limitations. (Tr. 252). Dr. Ali noted that all work-up was negative. (Id.). Dr. Ali also indicated that plaintiff was not a malingerer. (Tr. 251). Dr. Ali expressed the opinion that plaintiff could sit a total of two hours in an eight-hour workday, stand a total of two hours in an eight-hour workday, rarely lift or carry up to ten pounds until her hand pain issue resolves, and occasionally perform all postural activities. (Tr. 253-54). Dr. Ali also found that plaintiff's experience of pain or other symptoms would frequently interfere with attention and concentration needed to perform even simple work tasks. (Tr. 252).

The ALJ stated that he had considered Dr. Ali's finding that plaintiff could only rarely lift or carry even ten pounds, and had given it "very little weight." (Tr. 14). The ALJ stated that Dr. Ali's finding was very inconsistent with his own findings and that it appeared to be based on plaintiff's subjective reports. The ALJ pointed out that Dr. Ali found that plaintiff's reports of pain and

functional limitation were out of proportion to her actual physical impairments, and noted that all work-ups were negative.  (Tr. 13).  The ALJ stated that this suggests that plaintiff may be exaggerating her symptoms.  (Id.).

The undersigned finds that the ALJ provided sufficient reasons for assigning "very little weight" to Dr. Ali's opinion that plaintiff could only rarely lift or carry even ten pounds.  Opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data.  See Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995).  In this case, the ALJ found that Dr. Ali's opinion was not supported by his own treatment notes.  See Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

The ALJ noted that in a March 2009 visit, plaintiff reported that her pain was tolerable.  (Tr. 13, 317).  Upon examination, plaintiff exhibited a tender right medial epicondyle and contracture of her fifth digits bilaterally, although she had full wrist strength and hand grip strength.  (Id.).  On July 30, 2009, plaintiff was crying profusely and Dr. Ali administered injections for pain.  (Tr. 301-02).  Plaintiff continued to complain of bilateral hand pain on September 29, 2009, although it was noted that plaintiff had not tried the Tramadol that she had been given.  (Tr. 281).  In his Physical Residual Functional Capacity Questionnaire, Dr. Ali indicated that plaintiff's impairments were not reasonably consistent with her symptoms and functional limitations.  (Tr. 252).  Dr. Ali noted that all work-up was negative.  (Id.).  Further, subsequent EMG testing was normal.  (Tr. 369).  The ALJ's finding that Dr. Ali's opinion was inconsistent with his treatment notes and appeared to be based on plaintiff's subjective complaints is supported by the record.

- 19 -

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work. She is able to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently. She can sit for at least 6 hours in an 8-hour workday. She can stand and/or walk for up to 6 hours in a typical 8-hour workday. This description of the claimant's remaining work-related physical capabilities coincides with that described for light work in accordance with 20 CFR 404.1567(b).

(Tr. 9).

Determination of residual functional capacity ("RFC") is a medical question and at least "some medical evidence 'must support the determination of the claimant's [RFC] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of RFC is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of RFC, an ALJ may consider non-medical evidence, although the RFC finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The undersigned finds that the ALJ's residual functional capacity determination is not supported by substantial evidence. The ALJ did not provide a rationale for his residual functional capacity nor did he cite any medical opinions supporting his determination. Dr. Ali is the only physician who expressed an opinion regarding plaintiff's work-related limitations. While the ALJ provided valid reasons for questioning Dr. Ali's opinion, he cited no other medical evidence in support of his determination.

- 20 -

Further, Dr. Ali only treated plaintiff's hand impairments and his opinion did not address plaintiff's hernia impairment.  There is no opinion in the record from a physician, treating or consulting, regarding plaintiff's ability to function in the workplace with her hernia wound impairment and hand impairment.  As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform the full range of light work with her combination of impairments.  Plaintiff's non-healing hernia wound, which was continuing to drain, as well as the new hernia, would reasonably be expected to impose work-related exertional limitations.

The residual functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).  An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace.  See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  Here, the ALJ's residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence.  See Lauer, 245 F.3d at 703.

After determining plaintiff's residual functional capacity, the ALJ then found that plaintiff could perform her past relevant work.  (Tr. 14).  The undersigned has found that the residual functional capacity formulated by the ALJ was not supported by substantial evidence.  As such, the ALJ's step four determination was similarly  not supported by substantial evidence.

## **Conclusion**

In sum, the ALJ erred in formulating a residual functional capacity that was not based on substantial evidence.  For these reasons, this cause will be reversed and remanded to the ALJ in order

for the ALJ to obtain medical evidence addressing plaintiff's ability to function in the workplace with her impairments; and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  _12th_  day of March, 2012.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE